**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CRIMINAL ACTION NO. 3:17-CR-28-RGJ-CHL**

**UNITED STATES OF AMERICA,**  Plaintiff,

v.

**DONTA WATTS JR.,**  Defendant.

## ORDER

This matter is before the Court on a Motion to Suppress filed by Defendant Donta Watts, Jr. ("Watts"). (DN 60.) The United States filed a Response to the Motion. (DN 63.) The Motion to Suppress was referred to the undersigned Magistrate Judge by District Judge Rebecca Grady Jennings for a hearing, if necessary, and for findings of fact, conclusions of law, and recommendation. (DN 65.) The undersigned held an evidentiary hearing on October 3, 2018 and then set a deadline for the Parties to file post-hearing briefs. (DNs 81, 82.) Both Defendant Watts and the United States submitted a post-hearing brief. (DNs 89, 91.) Therefore, this matter is now ripe for review.

For the reasons stated herein, the undersigned **RECOMMENDS** that Watts's Motion to Suppress (DN 60) be **DENIED**.

**I.  FINDINGS OF FACT**

On June 2, 2016, Louisville Metro Police ("LMPD") Detectives Brad Beckham ("Beckham"), Steven Farmer ("Farmer"), and Justin Witt ("Witt") and LMPD Sergeant James Luckett ("Luckett") were conducting surveillance on an apartment located at 5105 Malibu Court, Apt. # 8, Louisville, Kentucky 40216 (the "Target Apartment"). (DN 85, at PageID # 203-04,

220-21, 260-61, 281-82).[1] The officers had been surveilling the apartment building at 5105 Malibu Court (the "Target Building"), in which the Target Apartment was located, for approximately a month prior to June 2 and had observed Defendant Watts making "short stays" and coming and going from the Target Building on multiple occasions. (*Id.* at 221, 228-29, 282.) Detective Beckham explained that a "short stay" is when a suspect enters a location for a short period of time, is gone for a longer period of time, then returns and repeats the process. (*Id.* at 229.) The Detective testified that based on his experience, this pattern of activity is consistent with narcotics trafficking because a suspect is coming back, picking something up, taking it out to sell it to someone, then repeating the process. (*Id.*) The officers had attempted to follow Watts on at least one such occasion after a short stay, but Watts used counter-surveillance/evasive driving maneuvers, and the officers were unable to follow him. (*Id.* at 221, 230.) The officers had also seen Defendant Charles Williams ("Williams") making short stays and coming and going from the building. (*Id.* at 222, 228-29.) The officers were aware that Watts had previous arrests and convictions for drug trafficking offenses, including convictions for trafficking in cocaine and marijuana. (*Id.* at 230-31; DN 84, at Gov'ts Ex. 3.) Based on their observations and Watts's criminal history, the officers suspected the men were using an Apartment in the Target Building for drug trafficking. (DN 85, at PageID # 229-30.)

On June 2, 2016, Detective Beckham was watching the Target Building from a vacant apartment in an adjacent building. (*Id.* at 221.) Given his vantage point on that date, Detective Beckham was able to observe Williams and Watts coming and going from the Target Apartment, not just the Target Building. (*Id.* at 221-23.) The Target Apartment was not rented to either

---

[1] The undersigned will refer to the transcript of the October 3, 2018 evidentiary hearing (DN 85) by reference to the Page ID#s found in the header placed on the transcript by the Clerk at the time of filing, not the internal page numbers of the transcript itself.

Williams or Watts and was instead in the name of a third party. (*Id.* at 229-30.) Detective Beckham testified that this was consistent with narcotics trafficking because in his experience, traffickers typically put apartments in the name of someone with no criminal history, to avoid detection. (*Id.* at 230.)

Detective Beckham observed Williams and Watts coming and going from the Target Apartment on June 2, 2016. (DN 85, at PageID # 221, 234.) Detective Beckham observed Watts enter and leave the Target Apartment on several occasions that day and saw Williams enter and leave on two occasions. (*Id.*) The second time Williams left the apartment, the officers decided to conduct a traffic stop. (*Id.* at 204, 221, 234, 261.) Sergeant Luckett and Detective Farmer conducted the traffic stop of Williams, and Williams was found to be in possession of both marijuana and a quantity of heroin that was approximately two to three times the amount expected for personal use. (*Id.* at 204, 206-07, 212, 261.) Based on this development, Detectives Witt and Detective Beckham switched places for Detective Witt to watch the Target Apartment while Detective Beckham returned to the division to draft a search warrant for the Target Apartment. (*Id.* at 234-35, 282.)

While Detective Farmer and Sergeant Luckett were conducting the traffic stop of Williams, a vehicle passed by with the window down, and the female driver, who was on the phone, could be heard saying something through the open window. (*Id.* at 204-05, 262.) Sergeant Luckett did not specifically recall what the woman said, but Detective Farmer recalled her saying something to the effect of "they have got Charles." (*Id.* at 204, 262.) Regardless of the specific verbiage, both Detective Farmer and Sergeant Luckett unequivocally testified that what was said made them concerned that someone was being alerted that Williams had been arrested. (*Id.* at 204-05, 262.) This raised concern that someone might attempt to remove or destroy evidence in the Target

3

Apartment before the officers could obtain a search warrant. (*Id.* at 207-09.) Detective Farmer and Sergeant Luckett alerted the other officers of their concerns. (*Id.* at 207-08, 262.) Sergeant Luckett then left the traffic stop to return to the Target Apartment. (*Id.* at 207-09.)

Thereafter, Detective Witt, who had taken over watching the Target Apartment for Detective Beckham, saw two men in a maroon GMC Envoy (the "Envoy") park in the parking lot behind the Target Building and enter the Target Apartment. (*Id.* at 241, 281-83.) These men were later identified as Watts and Co-Defendant Cantrell Chappell ("Chappell"). (*Id.* at 301-02.) Watts and Chappell were in the apartment for a short period and came out carrying items in trash bags. (*Id.* at 283-84.) One man was carrying a bag with a "box shape" to it and the other was carrying something in a trash bag in the same manner in which one would carry a cake. (*Id.* at 284.) Detective Witt testified that it looked as though the man was carrying something delicate the man did not want to spill or destroy. (*Id.*.) Detective Witt relayed over the radio that the men had left the apartment carrying trash bags that he felt contained evidence pertinent to the case. (*Id.*) After hearing Detective Witt's report over the radio, Detective Beckham headed back to the Target Apartment to attempt a traffic stop on the Envoy given the concern the men removed evidence from the premises for which Detective Beckham was currently drafting a search warrant. (*Id.* at 235.)

As Watts and Chappell were getting into the Envoy, Detective Witt exited the apartment and identified himself as police. (*Id.* at 284-85, 287, 293.) Watts and Chappell turned their heads in acknowledgement but did not stop getting into the car. (*Id.* at 285, 293.) Nearly simultaneously, Detective Beckham pulled into the back parking lot of the Target Building and found himself nose-to-nose with the Envoy driven by Watts. (*Id.* at 237, 285.) Recognizing Watts driving, Detective Beckham flipped on his lights and siren. (*Id.* at 237-38.) Watts attempted to put the Envoy in

4

reverse, but slipped it into neutral instead, and the officers heard the engine revving. (*Id.* at 235, 285.) Watts and Chappell then got out of the vehicle and ran in opposite directions. (*Id.* at 235-36, 285.)

Detective Beckham ran after Chappell, following him around the corner of a building just in time to see Chappell's arm come down like he had thrown something. (*Id.* at 235-36.) A subsequent search of that area located a firearm. (*Id.* at 239.) Detective Beckham eventually apprehended Chappell and returned him to the parking lot, where the Envoy had rolled into a parked car. (*Id.* at 235-36.) Watts was apprehended shortly thereafter by Sergeant Luckett and Detective Witt in a nearby apartment building. (*Id.* at 210-11, 288-89.) Detective Witt testified that Watts dropped a trail of money as he ran. (*Id.* at 236, 289.) After Watts and Chappell were apprehended, the officers approached the Envoy from which Watts and Chappell had fled and observed a gun case and a trash bag with a tray containing a substance that looked like heroin in plain view. (*Id.* at 240, 269.) Based on these events, Detective Beckham went back to the division to obtain a search warrant for the Target Apartment, Williams's vehicle, and the Envoy driven by Watts. (*Id.*) While Detective Beckham was obtaining a search warrant, Detective Farmer stayed on scene with the Envoy to ensure no one could get in and destroy or remove evidence. (*Id.* at 264.)

After a search warrant was obtained (DN 60-2), the subsequent search of the Envoy uncovered three firearms and trays containing heroin, cocaine, and methamphetamine. (DN 84, at Gov't Ex. 5; DN 85, at PageID # 242-44.) The search of the Target Apartment pursuant to the warrant obtained uncovered additional drugs, as well super mannitol, which is an agent for cutting narcotics. (DN 85, at PageID # 244-45, 291-92; DN 84, at Gov'ts Ex. 6.) Watts was charged with being a prohibited person in possession of a firearm, conspiracy to distribute heroin, conspiracy to

5

distribute methamphetamine, conspiracy to distribute fentanyl, and use of a firearm during and in relation to a drug trafficking crime. (DN 15.)

## II.    CONCLUSIONS OF LAW

Watts argues that all evidence obtained and statements made as a result of the investigate stop of his vehicle on June 2, 2016 and subsequent searches of his vehicle and the Target Apartment should be suppressed. (DNs 60, 89.) In response, the United States argues that the investigative stop and subsequent searches were lawful. (DNs 63, 91.) The undersigned will address the investigative stop and search of the Target Apartment separately below.

### A.    June 2, 2016 Investigative Stop

Watts argues that the investigative stop was not supported by reasonable suspicion. (DN 60, at PageID # 137-38.) The United States argues in response that the officers had articulable facts amounting to reasonable suspicion for the investigative stop. (DN 63, at PageID # 155-57.)

The Fourth Amendment protects against "unreasonable searches and seizures" and "its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Terry v. Ohio*, 392 U.S. 1, at 20 (1968). An investigatory stop is constitutional "if the officer [conducting the stop] has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005); *see also Terry*, 392 U.S. at 21; *Arvizu,* 534 U.S. at 273. A court reviewing the constitutionality of an investigative stop must examine the totality of the circumstances to determine whether the officer had the requisite suspicion of criminal activity. *United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012). More than a "hunch," but less than probable cause, is required. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

The undersigned must first consider when Watts was seized for purposes of the Fourth Amendment. Watts's Motion assumes that Watts was seized prior to when he fled on foot. (DN 60, at Page ID # 137.) However, the United States argues that Watts was not seized until he was captured by police after he fled on foot. (DN 63, at PageID # 154.) "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement, 'through means intentionally applied.'" *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991) and *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989)). However, "there is no seizure without actual submission; . . . there is at most an attempted seizure [in the absence of submission], so far as the Fourth Amendment is concerned." *Id.* at 254. Applying this principle, the Sixth Circuit in *United States v. Jones*, 562 F.3d 768, 774 (6th 2009), explained that "even though an occupant in a vehicle stopped by the police is generally deemed seized by virtue of the stopping of the vehicle, he is not thereby seized if he does not submit to the show of authority." Citing the United States Supreme Court's decision in *Brendlin*, the Sixth Circuit held that the defendant was not seized upon police stopping the vehicle in which he was a passenger because he jumped out of the car and submitted only when the police ordered him to stop. *Jones*, 562 F.3d at 774. *See also United States v. McCauley*, 548 F.3d 440, 443-44 (6th Cir. 2008) (holding that defendant was not seized until he exited the residence and compiled with police officer's instructions to hold his hands in the air because prior to that point "he had not submitted to any show of authority"). In the instant case, when Detective Witt identified himself as the police and asked Watts to stop, Watts got into his car anyway. When Detective Beckham attempted to initiate an investigative stop by turning on his sirens and lights, Watts's response was to attempt to put the vehicle into reverse and then get out of his vehicle and

7


run away. Based on these facts, the undersigned finds that Watts was not seized for purposes of the Fourth Amendment until he was apprehended by police in a nearby apartment building.

The undersigned must next determine whether the officers had reasonable suspicion that Watts was engaged in criminal activity as of the time he was seized. *See United States v. Jeter*, 721 F.3d 746, 755 (6th Cir. 2013) ("Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch.'"); *United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010) ("The determination of whether reasonable suspicion existed must be based on the totality of the circumstances in place at the time of seizure.") At the time they seized Watts, the officers: (1) had observed Watts making short stays consistent with drug trafficking in the Target Building for the past month; (2) had observed Watts making short stays consistent with drug trafficking in that Target Apartment on the day of his arrest; (3) were aware of Watts's past criminal convictions for drug trafficking; (4) had recovered narcotics from a separate suspect who had also made two short stays in the Target Apartment on the same day and who had departed the Target Apartment immediately prior to the traffic stop in which the drugs were found; and (5) had watched Watts and another man carry items in trash bags out of the Target Apartment for which they were drafting a search warrant, including something in a tray in a trash bag. These facts alone constitute reasonable suspicion.

However, because the undersigned concluded above that Watts was not seized for purposes of the Fourth Amendment until he was apprehended by police in a nearby building, Watts's flight can also be considered in assessing whether the police had reasonable suspicion. In *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), the Supreme Court held that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," and that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: [i]t is not necessarily indicative of wrongdoing, but is

certainly suggestive of such." The Sixth Circuit has routinely concluded that flight can support the existence of reasonable suspicion. *See Jeter*, 721 F.3d at 755 (holding that defendant's flight while grabbing the pocket of his shorts, leading officers to believe he had contraband, in a high crime area constituted reasonable suspicion); *Johnson*, 620 F.3d at 694 (collecting flight cases). In the instant case then, in assessing the totality of the circumstances, the undersigned must also consider that Watts refused to comply with one officer's order to stop and when another officer turned on his lights and siren, Watts fled the vehicle and ran away. Further, the police watched Watts spill a trail of money behind him as he ran.

Watts argues that the police stopped him "on a hunch," but the totality of the circumstances demonstrates that the police stopped Watts after observing activity consistent with drug trafficking on multiple occasions, after recovering narcotics from a suspect leaving the Target Apartment that Watts had also entered that same day, after observing Watts removing what they believed to be evidence from the Target Apartment for which they were drafting a search warrant,[2] and after Watts ran from police, leaving a trail of money behind him. On the basis of all these facts, the undersigned concludes that the police had the requisite reasonable suspicion to conduct the investigative stop of Watts.

### B. June 2, 2016 Search of Watts's Vehicle and the Target Apartment

Watts also argues that the search warrant issued for the Target Apartment relied too heavily on information obtained as a result of the "allegedly unlawful" investigative stop of Watts and that "[t]he four corners of the affidavit offered in support of the warrant failed to establish the probable

---

[2] Watts argued in his post-hearing brief that a *Terry* search cannot not be justified by the need to prevent destruction of evidence of a crime (DN 89, at PageID # 351), but in the instant case the police did not conduct a *Terry* search/frisk, they conducted an investigative stop. Additionally, Watts's argument ignores the wholly separate exception to the Fourth Amendment's warrant requirement to prevent the imminent destruction of evidence. *See Kentucky v. King*, 563 U.S. 452, 460-61 (2011). Therefore, the undersigned finds Watts's caselaw regarding *Terry* searches wholly distinguishable.

9

cause in support of the warrant without reliance on the vehicular stop." (DN 60, at PageID # 137-38.) Accordingly, Watts argues, the remaining facts in the affidavit in support of the search warrant do not constitute probable cause. (*Id.*) The United States argues in response that the search of the Target Apartment was lawful. (DNs 63, at PageID # 158-59; DN 91, at PageID # 366-67.)

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate 'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. Frazier,* 423 F.3d 526, 531 (6th Cir. 500) (quoting *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)). The findings of the judge who issued the search warrant are entitled to "great," though not "boundless," deference. *United States v. Leon*, 468 U.S. 897, 914 (1984) (citing *Spinelli v. United States*, 393 U.S. 410, 419 (1969)); *see also United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (quoting *United States v. Leake*, 998 F.2d 1359, 1363 (6th Cir. 1993) ("This court pays 'great deference' to a magistrate's findings, which 'should not be set aside unless arbitrarily exercised.'"). Finally, in determining the sufficiency of the evidence supporting probable cause, the reviewing court is limited to the information presented in the four corners of the affidavit. *Fraiser*, 423 F.3d at 531 (citing *Whiteley v. Warden Wyoming State Penitentiary*, 401 U.S. 560, 565 n. 8 (1971)).

The affidavit in support of the search warrant for the Target Apartment states that on June 2, the affiant observed Watts enter the Target Apartment via use of a key, leave a short time later, then return again approximately fifty minutes later. (DN 60-2, at PageID # 145.) Watts stayed for

approximately an hour and fifteen minutes the second time before departing the Target Apartment again. (*Id.*) The affiant also observed a second individual enter the Target Apartment via use of key on two separate occasions on June 2, staying less than ten minutes the first time, only to return an hour later and stay approximately twenty minutes. (*Id.*) The affidavit described such activity as "short stays indicative of drug trafficking." (*Id.* at 144.) A subsequent stop of the second individual recovered "suspected heroin and marijuana." (*Id.* at 145.) Another detective then observed two black males arrive at the Target Apartment, exit with trash bags, then rapidly renter and exit the Target Apartment again. (*Id.*) The affiant attempted a vehicle stop on the vehicle the two black males left in, whereupon the men attempted to flee by putting the car into reverse and then running away on foot. (*Id.*) The two men were identified as Watts and Chappell. (*Id.*) The affidavit also states that during the foot pursuit, Watts left a trail of money and Chappell threw a handgun away. (*Id.*) The affidavit further stated that "[a]n initial review of the scene revealed a large weapons/guns case behind the driver side and to the rear of the passenger seat tin foil cooking trays with a larger amount of suspected heroin was observed in plain view." (*Id.*) Based upon this information, a search warrant was issued for the Target Apartment and certain vehicles.

The undersigned has already concluded that the investigatory stop of Watts comported with the Constitution. Therefore, it was not error for Detective Beckham to include the information gleaned from the lawful investigatory stop in the warrant affidavit. Watts also argues that "any review of the warrant must address the clear reality that the affidavit did not mention any illicit activity being witnessed, by anyone, at the place requested to be searched." (DN 60, at PageID # 137.) However, Watts does not cite to any caselaw requiring an officer to witness illicit activity at the place to be searched in order to obtain a search warrant. Instead all that is required is there be a "nexus between the place to be searched and the evidence sought." *United States v. Van*

*Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998). Here, the undersigned finds that the affidavit at issue demonstrated the required nexus because it demonstrated that on two separate occasions, individuals who had departed the Target Apartment were found in possession of illegal drugs shortly thereafter. It follows then that there was a substantial likelihood that additional drugs would be found in the Target Apartment.

Accordingly, the undersigned finds that the information included in the four corners of the affidavit gave the issuing judge sufficient reason to believe that evidence of a crime would be located in the Target Apartment, and therefore, the search warrant was supported by probable cause.

## III. RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that Watts's Motion to Suppress (DN 60) be **DENIED**.

cc: Counsel of record

### Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations. A copy shall forthwith be electronically transmitted or mailed to all parties. 28 U.S.C. § 636(b)(1)(C). Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations. Fed. R. Crim. P. 59(b)(2). Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal. *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).